**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | |
|---|---|
| JAMES I. BURLISON,<br>RODNEY L. WAITS, and<br>BUFORD O'NEAL TANKERSLEY,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   No. 2:07-cv-02151-JPM-cgc<br>)<br>)<br>)<br>)<br>) |

---

**OPINION AND ORDER FOLLOWING NON-JURY TRIAL**

---

Plaintiffs bring this action against the United States pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).[1] The dispute centers on the location of the boundary between Plaintiffs' land ("Rorie tract") and the government's land ("Rice tract").

The Court held a bench trial in this case on September 27 and September 28, 2010. (Docket Entry ("D.E.") 72; D.E. 73.) Plaintiffs were represented by J. Houston Gordon, Esq. The government was represented by Gary Vanasek, Esq. Plaintiffs called the following witnesses: Marvin Nichols, Randy Cook,

---

[1] Plaintiffs' tort claims are for trespass and negligent destruction of property. (Order Granting in Part and Denying in Part Def.'s Mot. to Dismiss ("Order on Def.'s Mot. to Dismiss") (D.E. 40) 7.)

James Burlison, Buford O'Neal Tankersley, Cyburn Sullivan, and opinion witness Donald Cole. (D.E. 72.)  The government called the following witnesses: Zachary Green, Daniel Ungerecht, Milton Rice (who testified via deposition), and opinion witness Walter Bennett. (D.E. 73.)

For the reasons set forth below, the Court accepts the results of Donald Cole's survey and finds that the well is on Plaintiffs' land.  The Court further finds that Plaintiffs are entitled to $3496.00 in damages for their trespass claim. Accordingly, judgment is ENTERED in favor of Plaintiffs against the government.

## I. Findings of Fact

Many of the material facts are undisputed.  Below are the stipulated facts from the amended joint pretrial order:

> 1.   Plaintiffs' predecessors in title trace their ownership interest in certain property, commonly known as the Rorie tract, to a [w]arranty [d]eed from Myra B. Rice to Elvy and Lena Rorie dated September 11, 1941 and recorded in Book F-4, page 205 in the Register's Office of Lauderdale County, Tennessee.

> 2.   Plaintiffs acquired a [two-thirds] interest in the Rorie tract by virtue of six warranty deeds executed in August 2002 and November 2002 and recorded in the Register's Office of Lauderdale County, Tennessee as follows:

> > Book 479, page 468
> > Book 479, page 471
> > Book 479, page 474
> > Book 479, page 486
> > Book 479, page 477
> > Book 479, page 480

Book 479, page 483
Book 474, page 58

3.   The property conveyed by Myra B. Rice to Elvy and Lena Rorie in 1941 was a portion of Tract #2[,] previously acquired by [Myra B.] Rice from [the Battle M. Brown Co.], in a deed recorded in Deed Book U-3, page 192 in the Register's Office of Lauderdale County, Tennessee, on November 28, 1928.

4.   The government acquired property, commonly known as the Rice tract, owned by [Myra B.] Rice to the north of the Rorie tract by virtue of a warranty deed from the heirs of [Myra B.] Rice dated January 4, 1993, and recorded on February 16, 1993, in Deed Book 331, page 642 in the Register's Office of Lauderdale County [Tennessee].

5.   The location of the boundary between the Rorie [t]ract and the Rice [t]ract is the subject of the [instant] quiet title action.

6.   In late 2002[,] Plaintiffs drilled a water well for use in flooding their property during duck hunting season.

7.   Shortly thereafter [Lower Hatchie National Wildlife] Refuge Manager Randy Cook expressed some concern to James Burlison that the well might be on [government] property.

8.   Mr. Cook did not propose any immediate action by either party.

9.   Thereafter . . . Cook sought and obtained a survey of the boundary line between the [Rorie] [t]ract and the [Rice] [t]ract from Walter D. Bennett.

10.  The Bennett survey results, dated August 24, 2004, were provided to . . . Cook.

11.  Mr. Cook advised James Burlison of the survey results on September 1, 2004.

12.  After September 1, 2004, Plaintiffs removed the well[-]related equipment from the well site, but

reinstalled [the equipment] sometime prior to November 18, 2004.

13. On November 18, 2004, pursuant to 16 U.S.C. §§ 688dd-ee, Special Agent Zachary Green of the United States Fish and Wildlife Service seized (1) a John Deere power unit, (2) a 100-gallon fuel tank, (3) a Randolph power unit, and (4) a 50-foot extension pipe.

14. The Plaintiffs asserted ownership of the property seized by . . . Green.

15. The property seized by . . . Green was returned to [Plaintiffs] on September 11, 2007.

(Am. Joint Pretrial Order (D.E. 71) 4-5.)

This case presents a battle of the experts. Both sides offered testimony by professional surveyors in support of their arguments regarding the boundary between the Rorie tract and the Rice tract ("Rorie-Rice boundary"). The 1941 deed from Myra B. Rice to Elvy and Lena Rorie ("1941 Deed") describes the Rorie-Rice boundary:

> Beginning at the point where the Hatchie River intersects the east bank of the chute of the Mississippi River at low water mark; runs thence up said chute with its meanders at low water mark along the foot of the bank of the chute as follows: North 10° west 24 poles, north 15° west 16 poles, north 17 1/2° west 28 poles, north 20° west 20 1/2 poles to a stake, and marked willows on the bank, this corner, however, being at low water mark, this being the northwest corner of the tract herein conveyed and the southwest corner of the Mrs. Myra B. Rice lands of which this survey tract is a part; thence across the said Mrs. Myra B. Rice lands along a marked line, north 62° east 103 1/2 poles to the low water mark on the west bank of [the] Hatchie River, a marked box elder tree on the point of the bank; thence down the said Hatchie River at its low water mark with its

4

> meanders . . . according to survey made by J.L. Sloan
> 9-3-1941.

(Trial Ex. 1, 1941 Deed from Myra B. Rice to Elvy Rorie et ux. ("1941 Deed").)  No tree line or fence line marked the Rorie-Rice boundary in 1941.  (See Trial Ex. 41, Insert No. 14, 1941 Aerial Photograph.)

In 1965, Milton Rice[2] ("Rice") hired Milton Thornton ("Thornton") to survey the Rice tract.[3]  (Dep. of Milton Rice ("Rice Dep.") 22.)  Rice was concerned that Charles Shoaf[4] had encroached on Rice's property by "clearing part of what was accreted adjacent to [the Rice tract]."  (Id.)  Thornton marked what he believed to be the northern and southern boundaries of the Rice tract after completing his survey.  (Id.)  Rice placed signs along the "north line, and . . . put some along here [the southern line], [but] not too many . . . ."  (Id.)  Donald Cole ("Cole") testified that he has followed Milton Thornton's surveys "at least 30 [times]."  (Test. of Donald Cole ("Cole Test.") 16.)  He described Thornton's work as "lacking."  (Id. at 17.)

A tree line emerged at or near the Rorie-Rice boundary sometime in the 1960s.  (Rice Dep. 24-25.)  Rice believed that the tree line marked the Rorie-Rice boundary.  (Id. at 26.)

---

[2] Milton Rice is Myra B. Rice's son.  (Dep. of Milton Rice 17.)
[3] Elvy and Lena Rorie neither requested nor paid for the survey.  (Rice Dep. 39.)
[4] Charles Shoaf owned the land immediately north of the Rice tract.  Burlison v. United States, 533 F.3d 419, 421 (6th Cir. 2008).

Elvy Rorie erected a fence at or near the Rorie-Rice boundary sometime between 1956 and 1965.  (Id. at 69.)  Cyburn Sullivan ("Sullivan") hunted squirrels on the Rorie tract throughout the 1950s and 1960s.  (Test. of Cyburn Sullivan ("Sullivan Test.") 282.)  Sullivan testified that Elvy Rorie had made clear to him that the fence line marked the Rorie-Rice boundary.  (See id. at 283 ("[H]e let me hunt on his land there, all on his land, but I knew where the boundary lines were on his land."); see also id. at 285 ("I always understood the line to be [the fence line].").)

In 1979, B.P. McDow, Gladys McDow, Milton Huffman, and Ethyl Huffman (collectively "McDow") executed two quitclaim deeds ("1979 Quitclaim Deeds") in favor of Milton Rice and Lena Rorie.  (Trial Ex. 3, 1979 Quitclaim Deeds.)  McDow quitclaimed any interest in accretions that had formed east of a north-south conditional line.  (See id.; see also Rice Dep. 31 ("[W]e agreed that this was the . . . west boundary line of our property . . . .").)  The north-south conditional line was defined using state plane coordinates.[5]  (1979 Quitclaim Deeds.)

The government acquired the Rice tract in 1993.  (Trial Ex. 2, 1993 Warranty Deed from the Rice family to the United States ("1993 Warranty Deed").)  The 1993 Warranty Deed describes the

---

[5] The 1979 Quitclaim Deeds also describe an east-west conditional line.  (1979 Quitclaim Deeds.)  The east-west conditional line was defined using state plane coordinates.  (Id.)

southern boundary of the Rice tract using the same state plane coordinates that appear in the 1979 Quitclaim Deeds.  (1993 Warranty Deed; 1979 Quitclaim Deeds.)

Plaintiffs acquired the Rorie tract in 2002.  (Trial Ex. 4, 2002 Warranty Deeds from Lena Rorie's Heirs to Plaintiffs ("2002 Warranty Deeds").)  The 2002 Warranty Deeds describe the Rorie tract using descriptions from the 1941 Deed and the 1979 Quitclaim Deeds.  (See id.)

In 1997, Lower Hatchie National Wildlife Refuge ("Refuge") employees posted Refuge Boundary and Area Seasonally Closed ("Blue Goose") signs along a fence line at or near the Rorie-Rice boundary.[6]  (Trial Ex. 8, Internal Refuge Mem.)  Burlison testified that he believed that the fence line and the Blue Goose signs marked the Rorie-Rice boundary.  (Test. of James Burlison ("Burlison Test.") 129.)

Plaintiffs tried to drill a water well on the Rorie tract in September 2002.  (Id. at 144.)  The initial drilling occurred in an area significantly south of the disputed Rorie-Rice boundary.  (Id.)  The first well caved in, so Plaintiffs chose another location north of the original site.  (Id. at 145.)  The second site was "about a hundred yards, 300 something feet" south of the Blue Goose signs and fence line.  (Id. at 129.)

---

[6] The government concedes that Blue Goose signs "generally denote the location of the boundary of property owned by the [government]."  (Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Br.") (D.E. 76) 20.)

Burlison, Sullivan, and Buford O'Neal Tankersley testified that two United States Fish and Wildlife Service ("FWS") employees, Chris Graves ("Graves") and Michael Stroeh ("Stroeh"), watched the well being installed at the second site. (Id. at 133; Sullivan Test. 286; Test. of Buford O'Neal Tankersley ("Tankersley Test.") 153-54.) Neither Graves nor Stroeh objected to the installation. (Tankersley Test. 154.)

Refuge Manager Randy Cook ("Cook") learned sometime between December 2002 and December 2003 that Plaintiffs had installed a well. (Test. of Randy Cook ("Cook Test.") 92; Burlison Test. 129.) On December 20, 2003, Cook and Burlison met to discuss the well. (Burlison Test. 128-29.) Cook told Burlison that the well might be on government property. (Id. at 129.)

The FWS hired Walter Bennett in August 2004 to survey the Rorie-Rice boundary. (Test. of Walter Bennett ("Bennett Test.") 216.) Bennett completed his survey on August 25, 2004.[7] (Trial Ex. 41, Insert 1, Survey Report of Walter Bennett ("Bennett Survey").) After Cook received Bennett's survey, he told Burlison that the well was on government property. (Cook Test. 92; Burlison Test. 132.) Cook did not provide Burlison with a copy of the survey, nor did Cook take immediate action. (Cook Test. 92.)

---

[7] Bennett did not contact Plaintiffs before performing the survey. (Bennett Test. 219.)

Plaintiffs removed the well head, generator, fuel tank, and a length of pipe from the area around the well between September 1 and September 8, 2004.  (See Burlison Test. 133 ("I guess we just went ahead and decided to remove it, no special reason.").) Plaintiffs tried to drill another well at a third site in October 2004.  (Id. at 146.)  This attempt was unsuccessful. (Id.)  Plaintiffs reinstalled the well at the second site before the 2004 duck-hunting season began.  (Id. at 134.)  They pumped water from the well on November 13 and November 14, 2004.  (See id. ("We pumped it on a Saturday and Sunday . . . .").)

FWS Special Agent Zachary Green ("Green") seized Plaintiffs' well equipment on November 18, 2004.  (Test. of Zachary Green ("Green Test.") 160-61.)  Plaintiffs hired Cole to survey the Rorie-Rice boundary in October 2005.  (Cole Test. 19.)  He concluded that the Rorie-Rice boundary was north of Plaintiffs' well.  (Trial Ex. 29, Survey Report of Donald Cole ("Cole Survey") 16.)

The FWS returned the well equipment to Plaintiffs on September 11, 2007.  (Green Test. 161.)  Green testified that the equipment was in "good to excellent condition."  (Id.)  Cook testified that the FWS "put clean diesel fuel in the tank, . . . put a new battery on the John Deere power unit . . . and just refurbished [the equipment] to make sure that it was in good condition."  (Cook Test. 123; see also Burlison Test. 137 ("I

did not crank it, but it was in good condition . . . I did check everything out when I got it back to our shop.").)

## II. Conclusions of Law

### a. Plaintiffs' Acquiescence Argument

Plaintiffs argue that the government marked the Rorie-Rice boundary in 1997 by posting Blue Goose signs "along the 'old fence' built by Elvy Rorie (and recognized as the boundary line for 50 years, according to Cyburn Sullivan)." (Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.' Br.") (D.E. 77) 26.) Plaintiffs contend that (1) the posting of Blue Goose signs established the Rorie-Rice boundary and (2) the government "acquiesced in the posted boundary" when the government made no attempt to prevent Plaintiffs from installing the well at a site south of the Blue Goose signs. (Id. at 26-27.) The Court addresses Plaintiffs' acquiescence argument below.

The Quiet Title Act is the "exclusive means by which adverse claimants [can] challenge the United States' title to real property." United States v. Atanasoff, No. 86-1108, 1987 WL 24048, at *1 (6th Cir. Dec. 7, 1987) (quoting Block v. North Dakota, 461 U.S. 273, 286 (1983)). The Supreme Court has held that the government "is not to be deprived of those [property] interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property . . . ." United States v. California, 332 U.S. 19, 40 (1947).

Moreover, "officers who have no authority at all to dispose of
[g]overnment property cannot by their conduct cause the
[g]overnment to lose its valuable rights by . . . *acquiescence*,
laches, or failure to act." Id. (emphasis added); see also
United States v. Pappas, 814 F.2d 1342, 1343 n.3 (9th Cir. 1987)
("One cannot gain title to the land of the United States through
adverse possession.").

While the government does not dispute that the FWS uses
Blue Goose signs to mark Refuge's boundaries, it argues that
Plaintiffs have not shown that the particular Refuge employees
who posted the Blue Goose signs in 1997 had the authority to
bind the government.  (Def.'s Br. 20-21.)  The Court agrees.
Plaintiffs have offered no evidence that the Refuge employees
who posted the signs had any authority to bind the government.
See Tadlock v. United States, 774 F. Supp. 1035, 1041 (S.D.
Miss. 1990) ("[T]he error of a government employee in
incorrectly posting signs delineating the government's property
may not divest the United States of title to same.").
Accordingly, Plaintiffs' acquiescence argument fails.

### b. Plaintiffs' Estoppel Argument

Plaintiffs argue that the government should be estopped
from disclaiming the Blue Goose signs as the Rorie-Rice
boundary.  (Pls.' Br. 35.)  Plaintiffs contend that the
government's agents "acted intentionally and/or recklessly and

misled Plaintiffs[,] who relied upon the agents' actions, statements and silence to their detriment." (Id. at 42.) Plaintiffs point to the following actions in support of their estoppel argument: (1) the posting of the Blue Goose signs in 1997; (2) the FWS employees (Graves and Stroeh) who observed the well's installation but said nothing to Plaintiffs; and (3) Bennett's unilateral survey. (Id. at 38-42.) The Court addresses Plaintiffs' estoppel argument below.

An estoppel claim against a private person requires the following elements: (1) misrepresentation by the party sought to be estopped; (2) reasonable reliance on the misrepresentation by the party seeking estoppel; and (3) detriment to the party seeking estoppel. Mich. Express, Inc. v. United States, 374 F.3d 424, 427 (6th Cir. 2004). The government, however, may not be estopped on the same terms as a private litigant. Id. (citing Heckler v. Cmty. Health Servs. Of Crawford County, Inc., 467 U.S. 51, 60 (1984)). A party asserting estoppel against the government must also "demonstrate some 'affirmative misconduct' by the government." Mich. Express, 374 F.3d at 427; see also United States v. 18.16 Acres of Land, 598 F. Supp. 282, 288 (E.D.N.C. 1984) ("[T]he party seeking estoppel must show that the traditional elements of estoppel are present *and* that the government has engaged in affirmative misconduct."). The Sixth Circuit has described the affirmative misconduct standard as a

12

"very heavy burden."  Fisher v. Peters, 249 F.3d 433, 444 (6th Cir. 2001).

The Court declines to consider whether the government engaged in affirmative misconduct because Plaintiffs have not established the first element of an estoppel claim.  Plaintiffs have offered no evidence tending to show that the government knew the facts.  City & County of Denver v. Bergland, 695 F.2d 465, 482 n.14 (10th Cir. 1982) ("[T]he party to be estopped must know the facts.").  There is no evidence that the FWS employees who posted the Blue Goose signs in 1997 knew the precise location of the Rorie-Rice boundary.  See Tadlock, 774 F. Supp. at 1041 ("[T]he error of a government employee in incorrectly posting signs delineating the government's property may not divest the United States of title to the same.").  There is also no evidence that the FWS employees who observed the well's installation knew of any pending boundary dispute.  It was the government's lack of knowledge regarding the Rorie-Rice boundary that prompted Cook to seek a survey, an action that occurred after the well had been installed.[8]  (Bennett Test. 216.)  Accordingly, Plaintiffs' estoppel argument fails.

---

[8] The Court rejects Plaintiffs' contention that Bennett's survey is invalid pursuant to 43 U.S.C. § 772.  (Pls.' Br. 43.)  Forty-three U.S.C. § 772 applies only to public lands.  See 43 U.S.C. § 772 (discussing "surveys of public lands").  "Public lands" means "any land and interest in land owned by the United States . . . and administered by the Secretary of the Interior through the Bureau of Land Management . . . ."  43 U.S.C. § 1702(e).  The lands at issue here are not public lands and are not administered by the Bureau of Land Management.  See Paul W. Gates, History of Public Land Law

### c. Bennett and Cole Surveys

Plaintiffs point to a number of alleged flaws in Bennett's survey and urge the Court to accept Cole's survey instead. (Pls.' Br. 67.)  The Court credits Plaintiffs' objections to Bennett's survey and accepts the results of Cole's survey, for the reasons discussed below.

Bennett began from the premise that the tree line served as "the only evidence of the marked . . . boundary called for in the [1941] deed." (Bennett Test. 209.)  The tree line, however, did not exist in 1941.  (See Trial Ex. 41, Insert No. 14, 1941 Aerial Photograph.)  It is possible that the tree line was created in response to Thornton's 1965 survey.[9]  Nevertheless, Bennett assumed that the "tree line was the best evidence of the actual marked line called for in the [1941] deed." (Bennett Test. 256-57.)  This assumption was flawed.

Bennett never contacted Plaintiffs before performing his survey.  (Id. at 219.)  If Bennett had contacted Plaintiffs, he would have learned that Plaintiffs believed the Blue Goose signs

---

Development 54 (1968) ("Finally in [1841], Congress made Tennessee a [f]ederal agent for the management and disposal of [its] land.").
[9] The Court rejects the government's argument that the tree line represents the Rorie-Rice boundary by virtue of Elvy Rorie's acquiescence.  (See Def.'s Br. 17.)  A boundary may be established by acquiescence "where 'recognition and acquiescence [are] mutual, and both parties . . . have knowledge of the existence of a line as a boundary line.'"  Davis v. Cuel, No. E2006-02026-COA-R3-CV, 2007 WL 4548442, at *5 (Tenn. Ct. App. Dec. 27, 2007) (quoting Duren v. Spears, 1990 WL 59396, at *2 (Tenn. Ct. App. May 10, 1990)).  Whether a boundary line has been established by acquiescence depends on the parties' "acts or declarations[,] . . . [or] inferences or presumptions from their conduct, or on their silence."  Davis, 2007 WL 4548442, at *5.  Given the conflicting testimony of Rice and Sullivan, the Court cannot conclude that Elvy Rorie acquiesced in the tree line as the Rorie-Rice boundary.

marked the Rorie-Rice boundary.  (Burlison Test. 129.)  Bennett acknowledged on cross-examination that he "would [have] like[d] to have known about [the Blue Goose signs and the fence line] so [he] could have reviewed it."  (Bennett Test. 234.)  Bennett's failure to consider all relevant information regarding the boundary dispute constitutes a flaw in his methods.

Bennett testified that he did not find any of the natural objects, landmarks, artificial monuments, or markers contained in the 1941 survey.  (Id. at 197.)  Bennett used the tree line as a fixed point to project a line using the bearing reference (69 degrees and 42 minutes) contained in the 1979 Quitclaim Deeds until the line intersected the north-south conditional line.  (Id. at 198, 250.)  The resulting line fell slightly north of the state plane coordinate contained in the 1979 Quitclaim Deeds (Id. at 198-99.)  Bennett concluded that the tree line represents the "best evidence" of the Rorie-Rice boundary.  (Id. at 198.)

Bennett's reliance on the 1979 Quitclaim Deeds was misplaced.  The 1979 Quitclaim Deeds arose from a dispute between McDow and Rice over accretions to the west side of the Rice tract.  (Rice Dep. 31.)  They had no effect on the Rorie-Rice boundary.  Bennett admitted on cross-examination that the directional calls in the 1979 Quitclaim Deeds ("[t]hence north 69 degrees, 42 minutes east") differ from those in the 1941 Deed

("62 degrees")[10].  (Bennett Test. 225-26.)  Bennett acknowledged
that following the directional call in the 1941 Deed would place
the boundary north of his projected line.  (Id. at 226.)
Bennett's reliance on the 1979 Quitclaim Deeds constitutes a
flaw in his methods.

Cole conducted a more thorough inquiry than Bennett did.
Cole examined the 1941 Deed and other relevant deeds to discover
"errors or omissions in subsequent transfers."  (Cole Survey 3.)
Cole considered whether the tree line or the fence line
represented the Rorie-Rice boundary.  (Id. at 8, 11-12.)  He
found that the fence line "did not coincide with the distances
called for in any of the previously examined deeds."  (Id. at
8.)  Cole discounted the tree line as evidence of the Rorie-Rice
boundary because the tree line likely emerged after Thornton's
survey.  (Id. at 11-12.)  He testified that Thornton "wasn't a
very good field surveyor."  (Cole Test. 17.)

Cole found a possession line at or near what he
hypothesized was the north line of the Rice tract.  (Id. at 21.)
Cole then located the property lines of tracts lying north of
the Rice tract to confirm that the possession fence was the

---

[10] The 1979 Quitclaim Deeds state that "all bearings and coordinates [are]
scaled from maps and aerial photographs and referenced to the Tennessee State
Plane Coordinate System."  (1979 Quitclaim Deeds.)  In Cole's opinion, such
statements imply that no field survey was performed.  (Cole Test. 35 ("[T]hat
was not based on an actual field survey . . . the conditional deeds . . .
were based upon aerial photograph[s] . . . to scale and to establish the
conditional line.").)

north line of the Rice tract.[11]  (Id. at 21-22.)  He sought to establish the north line because it was the only boundary unaffected by the meanders of the Mississippi and Hatchie Rivers.  (Id. at 22.)

Cole used a 1901 survey of Thomas Bacon's lands ("Jeter survey") to verify that the north line of the Rice tract was also the north line of lot three of Thomas Bacon's lands.  (Id. at 27; see also Trial Ex. 10, 1901 W.O. Jeter Survey.)  The directional call of the north line in the Jeter survey is "south 62 degrees west and 413 poles."  (Cole Test. 27.)  The line between lots three and four of the Bacon lands ran parallel to the north line.  (Id. at 27 ("North 62 degrees east.  That's the line between lot[s] three and four.").)

The 1941 Deed preserves this parallelism.  The directional call of the Rorie-Rice boundary is "north 62° east 103 1/2 poles . . . ."  (1941 Deed; see also Cole Test. 28 ("[T]he north line of Rice and the south line of the remaining Rice tract should be very close to parallel.").)  Cole testified that Bennett's line is not parallel to the north line of the Rice tract.  (Cole Test. 30.)

---

[11] Cole found a "1 3/4 [inch] iron pipe by the Southwest corner of the USA-Tract 10- property . . . ."  (Cole Survey 9.)  An artificial monument, such as an iron pipe, may be used as evidence of a boundary.  Wood v. Starko, 197 S.W.3d 255, 259 (Tenn. Ct. App. 2006) (citing Thornburg v. Chase, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)).

After Cole reproduced the north line of the Rice tract, he reconstructed the north line of lots one, two, and three of Thomas Bacon's lands.  (Cole Survey 9.)  This allowed him to recreate lots three and four of Thomas Bacon's lands.  (Id.) Myra B. Rice acquired lot four from the Battle M. Brown Co. in 1928.  (See Trial Ex. 29, Insert 5, 1928 Deed from Battle M. Brown Co. to Myra B. Rice ("1928 Battle M. Brown Co. Deed") ("Tract #2 and Tract #3 are the same as Tract or Lot No. 4 of the lands of T.J. Bacon that were laid off to his son Milton E. Bacon . . . .").)  The 1941 Deed states that the northwest corner of the Rorie tract is the same as the "southwest corner of the Mrs. Myra B. Rice lands of which this survey is a part."[12] (1941 Deed.)  Cole found that the southwest corner of the Myra B. Rice property referenced in the 1941 Deed was also the northwest corner of the Rorie tract.  (Cole Survey 10; Cole Test. 31–32.)  Establishing the northwest corner of the Rorie tract enabled Cole to establish the Rorie-Rice boundary.  (Cole Test. 32.)  Cole's line is north of Bennett's line.  (Id.)

The Court finds by a preponderance of the evidence that Cole's methods are more reliable than Bennett's.  Cole, unlike

---

[12] The 1941 Deed explains that the Rorie tract is "a part of the same land deeded to Myra Bacon Rice by Battle M. Brown, being a part of the second tract described therein . . . ." (1941 Deed.)  The "second tract" described in the deed from the Battle M. Brown Co. to Myra B. Rice is lot four of Thomas Bacon's lands.  (See 1928 Battle M. Brown Co. Deed ("Tract #2 and Tract #3 are the same as Tract or Lot No. 4 . . . ."); see also Mitchell v. Chance, 149 S.W.3d 40, 44 (Tenn. Ct. App. 2004) ("The courts should first seek the parties' intention by examining the words in the deed . . . and by considering these words in the context of the deed as a whole.").)

Bennett, recognized and preserved the parallelism between the
north and south lines of the Rice tract.  Cole, unlike Bennett,
considered both the tree line and the Blue Goose signs in his
survey, though Cole ultimately determined that neither
represented the Rorie-Rice boundary.  Cole, unlike Bennett, did
not rely on the conditional lines contained in the 1979
Quitclaim Deeds.  The Court concludes that Cole engaged in a
more thorough inquiry than Bennett did.  The Court accepts the
results of Cole's survey.  Accordingly, the Court finds by a
preponderance of the evidence that the well is on Plaintiffs'
land.

### d. Plaintiffs' Tort Claims

Because the Court has found that the well is on Plaintiffs'
land, Plaintiffs' claims for trespass and negligent destruction
of property survive.  The FTCA provides that district courts
have subject-matter jurisdiction over "claims against the United
States, for money damages . . . for injury or loss of property
. . . caused by the negligent or wrongful act or omission of any
employee of the government while acting within the scope of his
office or employment" if a private actor could be held liable
for the same act or omission "in accordance with the law of the
place where the act or omission occurred."  28 U.S.C. §
1346(b)(1); see also Palmer v. United States, 146 F.3d 361, 366
(6th Cir. 1998) ("[T]he district court applies local law to

determine liability and to assess damages."). Plaintiffs' FTCA claims arise from acts occurring in Tennessee. Accordingly, the Court applies Tennessee law.

Under Tennessee law, "[e]very unauthorized entry upon another's realty is a trespass, regardless of the degree of force used or the amount of damage." Baker v. Moreland, No. 89-62-II, 1989 WL 89758, at *4 (Tenn. Ct. App. Aug. 9, 1989). The parties stipulated that "[o]n November 18, 2004, . . . Special Agent Zachary Green . . . seized [Plaintiffs' well equipment]." (Am. Joint Pretrial Order 5.) Green did not seek Plaintiffs' permission before entering their land. (Burlison Test. 134-35; Green Test. 160.) Accordingly, Green committed a trespass.

Nominal damages are always available in a trespass action. Jackson v. Bownas, No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *8 (Tenn. Ct. App. June 21, 2005); see also Price v. Osborne, 147 S.W.2d 412, 413 (Tenn. Ct. App. 1940) ("Every trespass gives a right to at least nominal damages."). A party may also recover compensatory and consequential damages in a trespass action. Jackson, 2005 WL 1457752, at *8; see also Price, 147 S.W.2d at 413 ("[T]he injured party can recover all consequential damages."). The proper measure of compensatory damages "is the cost of restoring the property to its condition prior to the injury or, alternatively, the diminution in market value." Magness v. Couser, No. M2006-00872-COA-R3-CV, 2008 WL

20

204116, at *8 (Tenn. Ct. App. Jan. 24, 2008).  Speculative

damages may not be awarded; rather, damages must be proved

"within a reasonable degree of certainty."  Redbud Coop. Corp.

v. Clayton, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985).

    Plaintiffs have offered no evidence as to (1) the cost of

restoring their property to its pre-trespass condition or (2)

the diminution in value resulting from the trespass.  Plaintiffs

have produced evidence of the consequential damages they

incurred.[13]  Specifically, Plaintiffs paid $3496.00 to rent a

hydraulic pump after their pump was seized.[14]  (Trial Ex. 33,

Dec. 14, 2005 Rental Invoice from Wilder Motor & Equipment Co.;

Trial Ex. 37, Dec. 8, 2005 Rental Invoice from Wilder Motor &

Equipment Co.)  Plaintiffs would not have incurred these rental

costs absent the trespass.  (Burlison Test. 139, 141.)

Accordingly, the Court finds that Plaintiffs are entitled to

$3496.00 in damages for their trespass claim.

---

[13] The Tennessee Supreme Court has explained the rule for the recovery of
consequential damages in tort: "[T]he injured party is entitled to recover
such damages [as] . . . might reasonably have been expected to follow from
the circumstances . . . ."  W. Union Tel. Co. v. Green, 284 S.W. 898, 901
(Tenn. 1926).  Consequential damages are "not limited or affected . . . by
what was in fact in contemplation by the party [at] fault."  Id.  Here, it
was reasonable to expect that Plaintiffs would rent a replacement hydraulic
pump after their pump was seized.
[14] Plaintiffs tried to drill a well at a third site in October 2004.
(Burlison Test. 146.)  This attempt occurred before the trespass.
Accordingly, the costs of this attempt may not be awarded as damages.

Plaintiffs assert a second tort claim for the "negligent/unlawful destruction" of their well equipment.[15] (Compl. (D.E. 1) ¶ 28.)  Plaintiffs do not directly address this cause of action in their post-trial brief.  (See Pls.' Br. 74-78.)  The government, in its post-trial brief, characterizes Plaintiffs' claim as one for trespass to chattels.  (See Def.'s Br. 32 ("Trespass to chattels is distinguishable from conversion primarily in the measure of damages recoverable for each.").)  This characterization is unhelpful because "Tennessee case law on the tort of trespass to chattels is virtually nonexistent." Holt v. Macy's Retail Holdings, Inc., 719 F. Supp. 2d 903, 914 (W.D. Tenn. 2010) (citing, inter alia, California and New York cases).  Accordingly, the Court construes Plaintiffs' second tort claim as one for negligence.

Tennessee courts define negligence as "the absence of ordinary care [that] a person of reasonable prudence would have exercised."  Stone v. Harris, No. 86-237-II, 1987 WL 13400, at *2 (Tenn. Ct. App. July 8, 1987).  The elements of a negligence claim are: (1) a duty of care owed by the defendant to the plaintiff; (2) breach of that duty by the defendant; (3) an injury or loss to the plaintiff; (4) causation in fact; and (5) proximate causation.  Colston v. Citizens Tri-County Bank, No.

---

[15] The Court dismissed Plaintiffs' (1) unlawful seizure, (2) conversion, and (3) unlawful detention of property claims on November 20, 2008.  (Order on Def.'s Mot. to Dismiss 7.)

M2003-01379-COA-R3-CV, 2004 WL 2363650, at *5 (Tenn. Ct. App. Oct. 20, 2004) (citing McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn. 1991)).  Every person has a duty not to damage his neighbor's property.  De Ark v. Nashville Stone Setting Corp., 279 S.W.2d 518, 522 (Tenn. Ct. App. 1955).  If the property can be repaired, then the proper measure of damages is the cost of repair plus the loss of use.  Tire Shredders, Inc. v. Erm-N. Cent., Inc., 15 S.W.3d 849, 855 (Tenn. Ct. App. 1999).  If the property cannot be repaired, then the proper measure of damages is the diminution in value of the property.  Id.

Plaintiffs have failed to establish a negligence claim because they have not proved any injury or loss by a preponderance of the evidence.  While it is undisputed that the government seized Plaintiffs' well equipment, Plaintiffs have not shown that the seizure resulted in any actual damage to the equipment.  Burlison testified that the equipment was in "good condition" when it was returned to Plaintiffs.  (Burlison Test. 137.)  Plaintiffs have not offered any evidence as to the value of the lost use of their equipment.  Plaintiffs have likewise not offered any evidence as to the cost of reinstallation.  (Id. at 140 ("I do not know what will need to be done.  I would have

to get a well [repair] man.").)  Accordingly, Plaintiffs'

negligence claim fails.[16]

## III. Conclusion

For the foregoing reasons, the Court accepts the results of

Donald Cole's survey and finds that the well is on Plaintiffs'

land.  The Court further finds that Plaintiffs are entitled to

$3496.00 in damages for their trespass claim.

IT IS SO ORDERED this 15th day of March, 2011.

_/s/ Jon P. McCalla_____
JON P. McCALLA
CHIEF U.S. DISTRICT JUDGE

---

[16] Plaintiffs are therefore not entitled to damages on their negligence claim.
See Colston, 2004 WL 2363650, at *6 ("Since [the plaintiffs] did not prove
damages, the trial court should have awarded them nothing . . . and, indeed,
should not have found [the defendant] negligent at all . . . .").